IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| OLIVIA COPE, on behalf of herself and all others similarly situated, known and unknown, | )<br>)<br>) |
| Plaintiff, | ) Case No. 6:16-cv-03050<br>)<br>) |
| v. | )<br>) |
| LET'S EAT OUT, INCORPORATED d/b/a BUFFALO WILD WINGS, JEREMY BOYER, individually, JAMES BRUNO, Individually, BRUNO MANAGEMENT COMPANY, INC., BRUNO ENTERPRISES, INC. TOO, WING BACKS, INC., SOONERS OR LATER, INC., HOT TEX, INC., and SPREADING OUR WINGS, INC. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO DEFENDANTS'
MOTION TO DECERTIFY FLSA CLASS AND MISSOURI STATE LAW CLASSES**

Defendants are just going through the motions. They have put forward less evidence at the decertification stage than they offered in opposing Plaintiff's original motions for class and collective action certification. And the paltry evidence Defendants have put forward – the walkout questionnaire results and three opt-in depositions – supports rather than erodes continued certification.

The questionnaire results support continued certification because they show that over 95 percent of servers and bartenders who reported experiencing walkouts or cash shortages were required to pay for them from their tips. This is overwhelming evidence that Defendants maintained and enforced a common illegal policy. That some servers and bartenders did not

experience a walkout or cash shortage is irrelevant to class certification at this stage, because that fact goes to damages, as this Court previously held.

The opt-in depositions demonstrate that Defendants relied on a critically deficient process to obtain declarations from then-current employees. Without those declarations – the same ones Defendants relied on in opposing collective action certification – Defendants have put forward no evidence to support decertification of the excessive non-tipped work claims in the case, much less the three other Fair Labor Standards Act ("FLSA") claims that Defendants ignore in their motion.

As demonstrated below, the evidence developed in discovery – including from Defendants' own witnesses – supports continued certification of the class and collective action claims. Defendants ignore this evidence, as if their own witnesses do not exist. As a result, the Court should deny Defendants' motion.

## I. Legal Standards

### A. Legal Standards for Decertification of a Rule 23 Class Action

According to the Eighth Circuit, proponents of decertification (here Defendants) bear the initial burden to prove that continued class treatment is inappropriate:

> "Generally, the proponent of a motion bears the initial burden of showing that the motion should be granted. Additionally, a district court maintains an independent duty to assure that a class continues to be certifiable under Rule 23(a). The existence of this independent obligation lends further support for requiring the movant to bear the burden of showing that the district court mistakenly maintained class certification. Moreover, a defendant bears a more onerous burden in challenging certification where ... the initial certification decision was carefully considered and made after certification-related discovery."

*Vogt v. State Farm Life Ins. Co.*, No. 2:16-CV-04170-NKL, 2018 WL 4937069, at *1 (W.D. Mo. Oct. 11, 2018) (quoting *Day v. Celadon Trucking Servs., Inc.*, 827 F.3d 817, 832 (8th Cir.

2

Case 6:16-cv-03050-SRB   Document 275   Filed 10/29/18   Page 2 of 15

2017)).

### B. Legal Standards for Decertification of an FLSA Collective Action

In resolving a motion to decertify an FLSA collective action, a court "must determine whether plaintiffs are similarly situated with respect to their job requirements and pay provisions." *Fast v. Applebee's Int'l, Inc.*, No. 06-4146-CV-C-NKL, 2009 WL 2391921, at *1 (W.D. Mo. Aug. 3, 2009) (citing *Grayson v. K-Mart*, 79 F.3d 1086 (11th Cir. 1996)). Of course, "[e]very group of plaintiffs will necessarily include individuals with different experiences[;] the question is simply whether the differences among the plaintiffs outweigh the similarities of the practices to which they were allegedly subjected." *Drake v. Steak N Shake Operations, Inc.*, 286 F. Supp. 3d 1040, 1043 (E.D. Mo. 2017) (quotation and citation omitted). In determining whether the plaintiffs are similarly situated, courts also consider three factors: "(1) individual plaintiff's disparate factual and employment settings, (2) defenses which are individual to each plaintiff, and (3) fairness and procedural considerations." *Fast*, 2009 WL 2391921, at *1 (citing *Keef v. M.A. Mortenson Co.*, No. 07-CV-3915 (JMR/FLN), 2009 WL 465030 (D. Minn. Feb. 24, 2009)). Differences between plaintiffs – such as variations by restaurant – do not justify decertification when the court can address these issues "through dividing the class into subclasses." *Fast*, 2009 WL 2391921, at *1.

## II. The Rule 23 Classes Should not be Decertified

### A. The Questionnaire Results Do not Defeat Typicality or Predominance

Defendants are wrong in asserting that class member questionnaire responses defeat typicality and predominance. Defs.' Suggs. in Supp. of Their Mtn. Decertify ("Defs.' Decert. Brief."), ECF No. 272, at 5-7. In moving for class certification, Plaintiff never claimed that every

3

potential class member paid for a walkout or cash shortage. Instead, Plaintiff claimed that Defendants enforced an illegal *policy* of requiring potential class members who experienced customer walkouts or cash shortages to pay for them from their tips. *See* Plt's Suggs. in Supp. of Her Mtn. for Rule 23 Class Cert., ECF No. 144, at 8. The parties already briefed this exact distinction:

- Plaintiff's opening brief in support of class certification: "Here, the central common question for Plaintiff's MMWL claim and Missouri common law claim is whether Defendants had a policy requiring servers and bartenders to return a portion of their tips to pay for customer walkouts and cash shortages." Plt's Suggs. in Supp. of Her Mtn. for Rule 23 Class Cert., ECF No. 144, at 8.
- Defendants' opposition to class certification: "Because Plaintiff's proposed classes include an untold number of individuals who have not suffered any injury, and therefore do not have a claim against either Let's Eat Out or Bruno Enterprises, Plaintiff's proposed classes are fatally overbroad." Defs.' Suggs. in Opp. To Plt's Mtn. for Class Cert., ECF No. 147, at 8, and 11-13 (applying same analysis).

In granting class certification, the Court agreed with Plaintiff that certification was appropriate even if not every member of the potential class experienced a walkout or cash shortage – and thus suffered damages. *See* Order, ECF No. 172, at 9-10. Defendants have provided no reasons why the Court should reconsider its previous order granting class certification.

In their opposition to Plaintiff's original class certification motion, Defendants asserted that they eliminated their illegal walkout policy in 2013, not mid-2015. Defs.' Suggs. in Opp. to

4

Case 6:16-cv-03050-SRB   Document 275   Filed 10/29/18   Page 4 of 15

potential class member paid for a walkout or cash shortage. Instead, Plaintiff claimed that Defendants enforced an illegal *policy* of requiring potential class members who experienced customer walkouts or cash shortages to pay for them from their tips. *See* Plt's Suggs. in Supp. of Her Mtn. for Rule 23 Class Cert., ECF No. 144, at 8. The parties already briefed this exact distinction:

- Plaintiff's opening brief in support of class certification: "Here, the central common question for Plaintiff's MMWL claim and Missouri common law claim is whether Defendants had a policy requiring servers and bartenders to return a portion of their tips to pay for customer walkouts and cash shortages." Plt's Suggs. in Supp. of Her Mtn. for Rule 23 Class Cert., ECF No. 144, at 8.
- Defendants' opposition to class certification: "Because Plaintiff's proposed classes include an untold number of individuals who have not suffered any injury, and therefore do not have a claim against either Let's Eat Out or Bruno Enterprises, Plaintiff's proposed classes are fatally overbroad." Defs.' Suggs. in Opp. To Plt's Mtn. for Class Cert., ECF No. 147, at 8, and 11-13 (applying same analysis).

In granting class certification, the Court agreed with Plaintiff that certification was appropriate even if not every member of the potential class experienced a walkout or cash shortage – and thus suffered damages. *See* Order, ECF No. 172, at 9-10. Defendants have provided no reasons why the Court should reconsider its previous order granting class certification.

In their opposition to Plaintiff's original class certification motion, Defendants asserted that they eliminated their illegal walkout policy in 2013, not mid-2015. Defs.' Suggs. in Opp. to

Plt's Mtn. for Class Cert., ECF No. 147, at 3. Defendants abandon that position in arguing for decertification because class member questionnaire responses provide no support for it. This means that Defendants have presented *less* evidence to support decertification than they presented in opposing class certification. When that is true, it is impossible for Defendants to have satisfied their burden to show continued certification is inappropriate. *Vogt*, 2018 WL 4937069, at *1 (quoting *Celadon Trucking Servs., Inc.*, 827 F.3d at 832 (describing the burden on the party seeking decertification)).

The class member questionnaire responses overwhelmingly support continued certification. Of class members who reported experiencing a customer walkout or cash shortage, over 95 percent were required to pay for that walkout or cash shortage from their tips. Attachment 1, Werman Decl., Exhibit A, Expert Report of Chester Hanvey, Ph.D., at 11. (Sept. 4, 2018). That is the most relevant statistic from the questionnaire results and it provides "strong empirical support that these [walkout and cash shortage] policies were actually enforced . . ." *Id.* The statistic provides no support for Defendants' original arguments against class certification about varying levels of enforcement by restaurant, manager, or time period. Defs.' Suggs. in Opp. To Plt's Mtn. for Class Cert., ECF No. 147, at 3.

### B. At Best, Defendants' Arguments Support Refining the Class Definitions

After arguing for decertification of the state-law classes, Defendants alternatively suggest that the Court reduce the classes to the individuals who reported paying for a walkout or cash shortage in their questionnaire responses. Defs.' Decert. Brief at 7. As explained above, the questionnaire results do not support limiting the classes at the liability stage. But even if the Court now decided that the classes must be limited to persons who paid for walkouts or

5

shortages, the appropriate relief is to modify the class definitions, not to decertify the classes altogether. *See In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 302 F.R.D. 448, 459 (N.D. Ohio 2014) ("decertification is a 'drastic step,' not to be taken lightly. Thus, if possible, modification of the class definition, or use of subclasses, is generally preferred.") (quoting H. Newberg & A. Conte, 2 Newberg on Class Actions § 7:37 at 190 (3rd ed. 1992)). Thus, rather than decertify the classes, the Court could – if it is sympathetic to Defendants' argument – modify the customer walkout/cash register shortage class definition to include only Defendants' Missouri servers and bartenders who paid for customer walkouts or cash register shortages.[1]

## III. The FLSA Collective Action Claims Should not be Decertified

### A. Defendants Only Seek Decertification Based on One of the Four FLSA Collective Action Claims in the Case

Defendants misrepresent the FLSA collective action claims in this case by suggesting that they are based solely on servers and bartenders spending more than 20 percent of their time performing non-tipped work. Defs.' Decert. Brief at 2. In fact, Plaintiff's FLSA claims are based on Defendants paying collective action members tip-credit wages while doing the following: (1) failing to inform them of the tip-credit provisions of the FLSA; (2) requiring them to perform non-tipped work "unrelated" to their tipped occupation, including cleaning bathrooms, slicing fruit, washing dishes, portioning food items in the kitchen, and sweeping, mopping, or deck

---

[1] Plaintiff need not review here why the state-law classes still satisfy the requirements under Rule 23(a) and (b)(3) that Defendants have not challenged. *See Santillan v. Gonzales*, No. C 04-2686 MHP, 2005 WL 1592872, at *13 (N.D. Cal. July 1, 2005) (after rejecting the defendants' mootness challenge, denying decertification without revisiting other Rule 23 requirements because they were unchallenged and thus remained satisfied for the reasons articulated in the Court's original class certification order).

6

scrubbing floors; (3) requiring them to perform non-tipped work that, even if it was otherwise "related" to their tipped occupation, exceeded 20 percent of their time worked in individual workweeks; and (4) requiring them to pay Defendants from their tips when they experienced customer walkouts or cash shortages. Fourth Amd. Rule 23 Class Action and FLSA Collective Action Compl. ¶¶ 98-101. Defendants only seek decertification of the FLSA claims based on (3), the 20 percent theory.

### B. The Opt-in Depositions Support Continued Certification

Defendants' argue that the 20 percent claim should be decertified because three Opt-in Plaintiffs gave deposition testimony that contradicted declarations those Opt-in Plaintiffs signed when employed by Defendants. Defs.' Decert. Brief at 7-9. But far from supporting decertification, the Opt-in Plaintiff depositions demonstrate that Defendants used a deficient process to obtain declarations from current employees.

The Opt-in Plaintiffs were interviewed for their declarations by Defendants' counsel during a shift at Defendants' restaurants.[2] Opt-in Plaintiffs Kaila Bryant and Carly Kelly testified

---

[2]  Attach. 1, Werman Decl., Exhibit B, Depo. of Kaila Bryant, 99:4-11 ("Q. During your meeting with counsel – did that take place in the restaurant, by the way? A. Yes. Q. Do you recall where in the restaurant that took place? A. In the dining room. Q. Was this during your shift? A. Yes."); Attach. 1, Werman Decl., Exhibit C, Depo. of Michelle Brockstedt, 99:17-24 ("Q. And where – it's my understanding that you met in the restaurant; is that correct? A. Correct. Q. Where in the restaurant did the meeting take place? A. We sat in a booth. Q. How long did the meeting last? A. About 15 to 20 minutes."); Attach. 1, Werman Decl., Exhibit D, Depo. of Carly Kelly, p. 9:19-10:5 ("Q. Okay. Tell me what you remember about your meeting with me at the restaurant back in 2016. A. I remember I got to work. And a manager – I don't recall who – told me that a lawyer was here to speak to me, that I needed to clock in and, you know, come speak to you. So I came and spoke to you. And you asked me a few questions, and I answered to the best of my recollection what I could answer. And that was it. And then I heard later – but I guess that doesn't matter. Q. You heard later what? A. About the lawsuit, what was actually going on with the lawsuit."

7

that they were instructed by a manager to talk to Defendants' counsel.[3] At the time, however, the Opt-in Plaintiffs were unaware that the interviewer represented Defendants in the lawsuit.[4] The interviewer failed to define the meaning of crucial terms in the declarations, such as "duties that are unrelated to serving guests" and "non-tip-producing activities."[5] And the "20 percent or less" statement that appears in each Opt-in Plaintiff's declaration was suggested to them by Defendants' counsel[6] or inserted into the declaration without consulting the Opt-in Plaintiffs.[7]

---

[3] Attach. 1, Werman Decl., Ex. B, Depo. of Kaila Bryant, p. 88:1-6 ("A. My manager – I don't remember who it was at the time, but my manager did ask me to sit down and speak with you. Q. Sure. A. It wasn't really – it was, hey, someone's coming in, you're going to sit down and talk with them."); Attach. 1, Werman Decl., Ex. D, Depo. of Carly Kelly, p. 9:19-10:2.

[4] Attach. 1, Werman Decl., Ex. B, Depo. of Kaila Bryant, p. 86:24-87:6 ("A. I remember you reading me the – not word for word, but the bottom part of it saying that you were going to ask me questions regarding the pay and whatnot. Q. Okay. A. And the top part, you introduced yourself and told me that you were an attorney with the lawsuit, but I was not entirely aware of which side you were representing."); Attach. 1, Werman Decl., Ex. C, Depo. of Michelle Brockstedt, p. 100:9-14 ("Did you understand at the time that you were meeting with Mr. Russell who he represented? A. No. Q. You were not clear during your meeting with Mr. Russell that he represented Buffalo Wild Wings? A. Correct."); Attach. 1, Werman Decl., Ex. D, Depo. of Carly Kelly, p. 10:6-9 ("Q. Okay. Do you remember me telling you during that meeting that I represent the company with respect to a lawsuit filed by an individual named Olivia Cope? A. No.").

[5] *See, e.g.,* Attach. 1, Werman Decl., Ex. D, Deposition of Carly Kelly, p. 76:7-10 ("Q. When you met with counsel, Mr. Russell, on June 30 of 2016, did Mr. Russell tell you how he was defining the term non-tip-producing activities? A. No.").

[6] Attach. 1, Werman Decl., Ex. B, Depo. of Kaila Bryant, p. 94:22-95:10 ("Q. The – in paragraph – Exhibit 1, paragraph 17, in the first sentence where it says at the end, quote "I would estimate that I spend approximately 20 percent of my time on these duties," end quote. Do you see that? A. Yeah. Q. Where did that 20 percent number come from? A. In my discussion with Mr. Russell, we were – a 15 to 20 percent was mentioned. I just – we kind of assumed. Q. Mentioned by counsel? A. Yes. Q. So you didn't come up with the 20 percent number yourself? A. No.").

[7] Attach. 1, Werman Decl., Ex. D, Depo. of Carly Kelly, p. 75:5-21 ("Q. And then on number 17, you said it was incorrect that – where it says, "I would estimate that I spend approximately 20 percent of my time on these duties." And you said today that it was more like

This is unsurprising given that the declarations are almost entirely boilerplate,[8] which undercuts their weight even without the subsequent depositions. *See Augustyniak v. Lowe's Home Ctr.,* No. 14-CV-00488-JJM, 2016 WL 462346, at *4 (W.D.N.Y. Feb. 8, 2016) (collecting cases). And the Opt-in Plaintiffs testified that they did not review or did not remember reading or reviewing the declarations prepared by Defendants' counsel before signing them.[9]

---

40 to 45 percent, right? A. Yes, sir. Q. Okay. Do you recall me asking you about that when we met? A. No. Not the particular question. Q. Okay. A. No. Q. You recall me asking you about your duties but not about a percentage? A. Right. Q. Okay. And you don't recall – I take it you don't recall telling me that your estimate was 20 percent? A. No.").

[8] *Compare* ECF No. 272-4, Decl. of Kayla Bryant, ¶ 18 (**"The amount of time I spend on pre-shift, post-shift, and other duties not directly involved in guest services (i.e. non-tip-producing activities) will change from shift to shift. This is because some days we are busier than others, and some days I will perform these duties faster or slower than on other days."**); ECF No. 272-6, Decl. of Michelle Brockstedt, ¶ 17 (**"The amount of time I spend on pre-shift, post-shift, and other duties not directly involved in guest services (i.e., non-tip-producing activities) will change from shift to shift. This is because some days we are busier than others, and some days I will perform these duties faster or slower than on other days."**); ECF No. 272-8, Decl. of Carly Kelly, ¶ 18 (**"The amount of time I spend on pre-shift, post-shift, and other duties not directly involved in guest services (i.e., non-tip-producing activities) will change from shift to shift. This is because some days we are busier than others,** some days I am the closer, **and some days I will perform these duties faster or slower than on other days."**) (emphasis added to show identical language). *Compare also* ECF No. 272-4, Decl. of Kayla Bryant, ¶ 17 (**"While I do not generally track how much time I spend on my various** pre- and post-shift **duties that are unrelated to serving guests, I would estimate that I spend approximately 20% of my time on these duties."**); ECF No. 272-6, Decl. of Michelle Brockstedt, ¶ 16 (**"While I do not generally track how much time I spend on my various duties that are unrelated to serving guests, I would estimate that I spend** less than **20% of my time on these duties."**); ECF No. 272-8, Decl. of Carly Kelly, ¶ 17 (**"While I do not generally track how much time I spend on my various duties that are unrelated to serving guests, I would estimate that I spend approximately 20% of my time on these duties."**) (emphasis added to show identical language).

[9] Attach. 1, Werman Decl., Ex. B, Depo. of Kaila Bryant, p. 82:21-83:1 ("Q. Do you remember reading this declaration before you signed it? A. No. Q. Do you remember being asked to read the declaration before you signed it? A. No."); Attach. 1, Werman Decl., Ex. C, Deposition of Michelle Brockstedt, p. 86:15-18 ("Q. Did you have an opportunity to read this declaration before signing it? A. Not that I can recall. I know I was working at the time. So I

Defendants attempted to shore up their dubious declaration-gathering process by having the Opt-in Plaintiffs sign a Notice of Rights and Consent to Interview document during their interview with Defendants' counsel. However, the three Opt-in Plaintiffs testified that they do not recall reviewing the Notice of Rights document and that its contents were not explained to them.[10] Defendants' declarations are unreliable and should not be considered for purposes of Defendants' motion for decertification. *See Sjoblom v. Charter Commc'ns, LLC,* No. 3:07-cv-0451-bbc, 2007 WL 5314916, at *4 (W.D. Wis. Dec. 26, 2007) (striking affidavits obtained by defendants' counsel when affiants did not recall signing the consent forms and the forms did not sufficiently warn affiants that they may be part of the lawsuit).

Additionally, Defendants cite no authority for their argument that Opt-in Plaintiffs' deposition testimony somehow disqualifies them from pursuing their claims. Defs.' Decert. Brief at 9-10. Thus, Defendants' request that the Opt-in Plaintiffs be somehow "disqualified" from the litigation should be denied.

---

don't recall."); Attach. 1, Werman Decl., Ex. D, Deposition of Carly Kelly, p. 19:11-15 ("Q. Okay. Do you recall reviewing the declaration at all? A. No. Q. Either electronically or in hard copy? A. No.").

[10] Attach. 1, Werman Decl., Ex. B, Depo. of Kaila Bryant, p. 86:18-22 ("Q. Okay. And do you remember – I know you many not remember that it was me, but do you remember me reading everything in this document to you before I asked you any questions about your job? A. Not specifically everything, no."); Attach. 1, Werman Decl., Ex. C, Depo. of Michelle Brockstedt, p. 102:22-103:8 ("Q. Do you recall me reading everything in this document to you, word for word, before I asked you any substantive questions about this case or about your job duties? … A. I do not recall this being read to me word for word."); Attach. 1, Werman Decl., Attach. 1, Werman Decl., Ex. D, Depo. of Carly Kelly, p. 15:10-16:1 ("Q. Okay. Do you recall me reading this document, the language of this document to you, prior to asking you any substantive questions during our meeting? A. No. Q. Okay, and again, does that mean you don't recall one way or the other … A. No. I don't recall ever – no – you explaining this at all. Q. Okay. A. No. Q. And, again, are you saying I didn't explain it, or are you saying I could have, you just don't recall me doing it one way or the other … A. I'm saying you didn't. Because all of

### C. Dr. Hanvey's Expert Analysis of Time and Check Data Supports Continued Certification of the 20 Percent Claim

Objective data supports collective treatment of the 20 percent claim. Plaintiff's expert, Dr. Chester Hanvey, performed a systematic analysis of Defendants' time clock and customer check data that showed the gap between a tipped employee's (1) clock in time for a shift and first customer served ("Open Gap"), and (2) last customer served during a shift and clock out time for the shift ("Closing Gap"). Attach. 1, Werman Decl., Exhibit E, Expert Report of Chester Hanvey, Ph.D (July 17, 2017) at 5-6. Dr. Hanvey determined that for the 126 tipped employees whose data he analyzed, 85.7% of those individuals' combined Open and Closing Gap time exceeded 20% of their time worked in at least one workweek. *Id.* at 8. Dr. Hanvey also concluded based on his data analysis that tipped employees spent an average of 18.2 percent of their work time performing work before opening their first customer check or after closing their last customer check. *Id.* at 8-9.

Defendants' decertification motion does not even mention Dr. Hanvey's analysis of Defendants' own time clock and customer check data. Nor have Defendants moved to exclude Dr. Hanvey's analysis under *Daubert*. Defendants' *Daubert* motion is limited to Dr. Hanvey's analysis of the walkout/cash register shortage questionnaire. *See generally* Defs.' Mtn. to Exclude Testimony of Expert Witness, Chester Hanvey, ECF No. 268. This is significant because Dr. Hanvey's analysis provides objective evidence that supports Plaintiff's 20 percent theory. The Open and Closing Gap time alone does not establish a violation for all collective action members, but that evidence does not address additional running side work tipped employees complete in between serving customers. The Parties' witnesses all agree tipped employees

---

this, if this was all explained to me, I would remember."

perform this work running side work. *See* Plt's Suggs. in Supp. of Her Mtn. for Step-One Notice, ECF No. 36, at 7 (Section II.B.5); Attach. 1, Werman Decl., Exhibit F, Boyer Depo. at 259:19-260:15 (Defendants' corporate representative identifying "running duties" or "side work" tipped employees perform during a shift when not serving customers). At trial, representative witnesses will establish how long this running side work takes to perform, which will be sufficient to establish a violation under the 20 percent theory for all collective action members.

### D. Defendants' Witnesses Confirm that Collective Action Members Are Similarly Situated

Defendants' brief does not analyze the traditional decertification factors[11] because those factors support continued certification. First, collective action members are similarly situated with respect to their pay because Defendants paid them tip-credit hourly wages. Defs.' Answer to Plt's Fourth Amd. Compl., ECF No. 219, ¶ 13; Attach. 1, Werman Decl., Ex. F, Boyer Depo. at 81:7-20, 289:23-290:4. Second, collective action members are similarly situated with respect to their job requirements because Defendants required tipped employees to perform alleged non-tipped work each shift, including before the restaurants opened to customers, in between serving customers, after being cut from serving customers, and as part of closing the restaurants. Attach. 1, Werman Decl., Ex. F, Boyer Depo. at 127:14-128:8 (opening servers), 132:2-14 (opening server duties), 157:4-158:6 (opening bartender duties), 259:19-260:15 (running duties or side-work in between serving customers), 257:23-259:1 (cut work duties), 175:21-176:5 (bartender closing), 206:16-20 (server closing). While Defendants may argue that collective action members did not perform identical tasks each shift, that fact is irrelevant. *See Driver v. AppleIllinois, LLC*, No. 06 C 6149, 2013 WL 5818899, at *9 (N.D. Ill. Oct. 29, 2013) ("The fact

12

that [defendant's] employees performed different tasks in their dual jobs did not defeat certification, did not support [defendant's] first motion for decertification, and does not require decertification now").

The remaining decertification factors – differences in factual and employment settings, individualized defenses, and fairness/procedural considerations[12] – also support continued certification. In their decertification motion, Defendants identify no relevant differences in factual or employment settings. And testimony from Defendants' corporate representative witnesses undercuts any suggestion of relevant differences. Defendants' commonly owned restaurants distribute the same policies to newly hired employees, use common human resources employees, and employ common regional managers who get the same instructions about enforcing policies across restaurants. Attach. 1, Werman Decl., Exhibit G, Del Rio Depo. at 133:11-24, 42:20-44:9; Attach. 1, Werman Decl., Ex. F, Boyer Depo. at 288:9-18; Attach. 1, Werman Decl., Exhibit H, Bruno Depo., at 31:19-32:5; 40:2-8; 81:5-8. As for individualized defenses, Defendants have identified none other than against the three Opt-in Plaintiffs who testified that their previous declarations were inaccurate. Defenses to three Opt-in Plaintiffs' claims – especially when based on declarations gathered through a deficient process – hardly merits decertification when the major defenses turn on Defendants' entitlement to take a tip credit for certain quantities and categories of work. *Fast*, 2009 WL 2391921, at *1. Finally, fairness and procedural considerations support continued certification because the FLSA is a remedial statute that should be interpreted in favor of employee coverage, yet many collective

---

| | |
|---|---|
| 11 | *See* Section I.B, above. |
| 12 | *See* Section I.B., above. |

13

action members would be foreclosed from pursuing their claims on an individual basis because of their relatively small value if decertification were granted. *Fast*, 2009 WL 2391921, at *2.

**IV. Conclusion**

The evidence overwhelmingly supports continued certification of the class and collective action claims in this case. As a result, the Court should summarily deny Defendants' motion.


Dated: October 29, 2018					Respectfully Submitted,

							/s/Douglas M. Werman
							One of the Attorneys for Plaintiff

Douglas M. Werman – admitted *pro hac vice*
Zachary C. Flowerree – admitted *pro hac vice*
Sarah J. Arendt – admitted *pro hac vice*
Werman Salas P.C.
77 West Washington St., Suite 1402
Chicago, Illinois 60602
Phone: (312) 419-1008
Fax: (312) 419-1025
dwerman@flsalaw.com
zflowerree@flsalaw.com
sarendt@flsalaw.com

Rowdy B. Meeks, MO #48349
Rowdy Meeks Legal Group LLC
8201 Mission Rd, Suite 250
Prairie Village, Kansas 66208
Tel: (913) 766-5585
Fax: (816) 875-5069
Rowdy.Meeks@rmlegalgroup.com

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was electronically filed on October 29, 2018 with the Clerk of the Court and therefore served via the Court's electronic filing system on the following counsel of record.

- Kyle B. Russell    kyle.russell@Jacksonlewis.com,
- Kirsten Milton    Kirsten.Milton@jacksonlewis.com
- Phillip Thompson Phillip.Thompson@jacksonlewis.com
- Paul DeCamp    pdecamp@ebglaw.com

/s/Douglas M. Werman
One of Plaintiff's Attorneys